UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROLANDO FLORES,

    Petitioner,

v.

CATHLEEN STODDARD,

    Respondent.

Case No. 14-13199
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

Petitioner Rolando Flores and an accomplice invaded John Ledbetter's home at night in an attempt to rob him. One of the two masked assailants stabbed Ledbetter several times, and he died months later. An Oakland County Circuit Court jury convicted Flores of first-degree felony murder, and the trial court imposed a life sentence. Before the Court is Flores's *pro se* habeas petition under 28 U.S.C. § 2254, which raises two claims: (1) the evidence at trial was insufficient to prove that he caused Ledbetter's death, and (2) the prosecutor improperly vouched for the credibility of prosecution witnesses. For the reasons that follow, the Court will deny the petition.

**I.**

Just hours before his vicious stabbing, John Ledbetter and his soon-to-be assailant enjoyed a cookout together. (R. 6-3, PID 199.) Ledbetter eventually told his cookout companions to leave so that he could go to sleep, and he went to sleep in a living room chair. (*Id.*, PID 199-

200.)[1] The soon-to-be assailant, Petitioner Rolando Flores, did not leave for long.

At some point, Ledbetter heard someone say "hey" at the door. (*Id.*, PID 200.) When he went to the peephole, the door "came down on top of [him]," and two people demanded his money and guns and threatened to kill him. (*Id.*) Though the two assailants were masked or hooded, Ledbetter recognized Flores's voice and testified that he had no doubt that it was him. (*Id.*, PID 200–01, 203.) A neighbor also overheard part of the struggle and recognized Flores's distinctive voice. (R. 6-3, PID 194, 198.) The assailants proceeded to beat Ledbetter mercilessly. One of the men also stabbed him multiple times, breaking the knife's blade off in his thigh. (*Id.*, PID 203.) After tearing through Ledbetter's home, the assailants fled empty-handed. (*Id.*, PID 201, 203.) For a time, Ledbetter survived the incident.

It did not take long for the police to zero in on Flores. Ledbetter told police after the incident that "Rally Flores" was one of the assailants. (R. 6-3, PID 212.) Ledbetter's neighbor and an anonymous tipper also implicated Flores. (R. 6-3, PID 213.) And in a post-arrest interview, Flores admitted that he was involved, identified his accomplice as Carlos Ramirez, and said that they discarded their clothes and the knife after the incident. (*Id.*, PID 213–14.) Flores maintained that while he kicked down Ledbetter's door, Ramirez was the one who stabbed Ledbetter. (*Id.*, PID 214, 218.)

Ledbetter died months later, on January 2, 2011. The primary issue disputed at trial was whether the stab wounds killed him. A unanimous jury thought so, finding Flores guilty of first-degree felony murder.

Following his conviction, Flores appealed to the Michigan Court of Appeals, raising claims that the prosecutor improperly vouched for the credibility of certain State witnesses and

---

[1] Following Ledbetter's death, the transcript of his preliminary examination testimony was read into the record at Flores's trial.

that the evidence was insufficient to prove that he caused Ledbetter's death. (R. 6-6, PID 300.) The Michigan Court of Appeals affirmed Flores's conviction in an explained decision. *People v. Flores*, No. 309262, 2013 WL 1490618, at *1 (Mich. Ct. App. Apr. 11, 2013) (per curiam). Flores raised the same claims in an application for leave to appeal to the Michigan Supreme Court. (R. 6-7, PID 382–84.) But the Michigan Supreme Court denied the application in a summary order because it was "not persuaded that the questions presented should be reviewed." *People v. Flores*, 836 N.W.2d 158 (Mich. 2013) (unpublished table decision). Flores filed his federal habeas petition in August 2014, raising essentially the same claims as his direct appeal:

> [1] The prosecutor violated [his] state and federal constitutional right of Due Process of the Fourteen[th] Amendment.
>
> [2] Insufficient evidence . . . to prove that [he] was the primary cause of death of the decedent.

(R. 1, PID 6–7.) Flores has not sought state-court post-conviction relief.

## II.

The standard of review this Court applies to each of Flores's claims depends on whether the claim was "adjudicated on the merits in State court[.]" 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 586 U.S. 289 (2013). If the Michigan Court of Appeals decided a claim "on the merits," the Antiterrorism and Effective Death Penalty Act of 1996 prohibits this Court from granting habeas corpus relief unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d). But "[w]hen a state court does not address a claim on the

3

merits, . . . 'AEDPA deference' does not apply and [this Court] will review the claim *de novo*." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

### III.

### A.

The Court will first address Flores's claim that the prosecution presented insufficient evidence at trial to prove beyond a reasonable doubt that his actions caused Ledbetter's death.

The Michigan Court of Appeals reviewed this claim "on the merits," so AEDPA deference applies. The court began its analysis by discussing at length authority on the governing standards for the sufficiency of the evidence and causation. *Flores*, 2013 WL 1490618, at *2. The Court then summarized the relevant testimony and concluded that the evidence, viewed in the light most favorable to the prosecution, "especially the testimony of Dr. Mason and Dr. Virani, was sufficient to enable the jury to find beyond a reasonable doubt that the victim's death was 'a direct and natural result' of the multiple stab wounds inflicted by defendant or his accomplice." *Id*. (Dr. Mason, Ledbetter's longtime treating physician, testified about Ledbetter's health condition following the incident and certain preexisting conditions, including cirrhosis of the liver, chronic obstructive pulmonary disease, emphysema, alcoholism, and drug use; Dr. Virani, the Oakland County Deputy Chief Medical Examiner who performed the autopsy, testified about the autopsy and his conclusion that the stab wounds were the main cause of Ledbetter's death.) Flores has an uphill battle to overcome the Michigan Court of Appeals' conclusion, and it is one he cannot win on this record.

To assess a sufficiency of evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Davis v.*

*Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The *Jackson v. Virginia* standard 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). What is more, the standard "is so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)). "Adding to this extremely high bar are the stringent and limiting standards of AEDPA," which allows for reversal of "a state court's decision that correctly identified and applied the controlling Supreme Court precedent only if the application of that precedent was objectively unreasonable, meaning more than incorrect or erroneous." *Id*. (internal quotation marks and citations omitted).

Flores challenges the sufficiency of the evidence only as to whether the stab wounds caused Ledbetter's death. The *Jackson* standard "is applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law,'" so the Court will look to Michigan law on causation. *See Lafler*, 658 F.3d at 531 (quoting *Jackson*, 443 U.S. at 324 n.16). Under Michigan law, "the causation element of an offense is generally comprised of two components: factual cause and proximate cause." *People v. Schaefer*, 703 N.W.2d 774, 785 (Mich. 2005), *holding modified on other grounds by People v. Derror*, 715 N.W.2d 822 (2006). "In determining whether a defendant's conduct is a factual cause of the result, one must ask, 'but for' the defendant's conduct, would the result have occurred?" *Id*. "For a defendant's conduct to be regarded as a proximate cause, the victim's injury must be a 'direct and natural result' of the defendant's actions." *Id.*

The Michigan Court of Appeals summarized the evidence establishing causation as follows:

> The victim's daughter testified that before the offense in April 2010, the independent 56–year–old victim lived alone, shopped for his own groceries, paid his bills, frequently cared for his mother who lived nearby, "loved to work on" cars and lawnmowers, and "loved to cook out." Dr. Jeffrey Mason, who saw the victim regularly beginning in 2005, similarly described that the victim could "shop and cook and do everything like that, activities of daily living." Dr. Mason testified about the victim's extensive hospitalizations between April 2010 and his placement in end-of-life care in December 2010, primarily due to the post-stabbing injection of bacteria into a hip joint, which by late April 2010 had turned untreatably septic. Dr. Mason also related that as of June 2010, the victim had severe pain and could no longer clean himself, walk, shop, or cook.
>
> Forensic examiner Dr. Kanu Virani characterized the death as a homicide and opined that the "main factor" in the victim's cause of death was the "multiple stab wound[s]." Dr. Virani also acknowledged that there were other "complications" that contributed to the victim's death, which included "alveolar damage, pneumonia and blood loss." Although Dr. Virani conceded that the victim's preexisting liver cirrhosis and chronic obstructive pulmonary disorder factored into his ultimate demise, he nonetheless characterized these conditions as causes secondary to the stabbing. Dr. Virani explained that the stabbing was the "initial point of everything happening in this case," which then "naturally or necessarily progressed" to pneumonia and death.

*Flores*, 2013 WL 1490618, at *2 (alteration in original).

Construing Flores's *pro se* petition liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), it appears that he contends that Ledbetter's alcohol and drug use, including crack cocaine, amounted to an intervening cause of death. Among other things, Flores says that the alcohol "stop[ped] the medication from working and killing any infection that may come" and that Ledbetter's wounds "got infected by not properly cleaning the wound," thus killing him and "breaking the link" from Flores's conduct. (R. 1, PID 7.) Flores's petition points to no specific evidence to support these assertions.

It is true that in determining whether proximate cause has been established, "it is necessary to examine whether there was an intervening cause that superseded the defendant's

6

conduct such that the causal link between the defendant's conduct and the victim's injury was broken." *Schaefer*, 703 N.W.2d at 785. "The standard by which to gauge whether an intervening cause supersedes, and thus severs the causal link, is generally one of reasonable foreseeability." *Id*. Although "an act of God or the *gross* negligence or intentional misconduct by the victim or a third party will generally be considered a superseding cause, *ordinary* negligence by the victim or a third party will not be regarded as a superseding cause because ordinary negligence is reasonably foreseeable." *Id.* at 786 (emphasis in original).

The Michigan Court of Appeals specifically addressed this point, rejecting Flores's claim that Ledbetter's use of alcohol and hydrocodone contributed to his death, citing Dr. Virani's testimony:

> Dr. Virani opined that alcohol consumption would not have had any effect on the alveolar damage unless the consumption somehow resulted in the person passing out, becoming unresponsive, and being unable to breathe. And while Dr. Virani acknowledged that a person who consumed "too much" hydrocodone would be affected in his ability to breathe, he subsequently confirmed that the quantity of hydrocodone that the victim received during his end-of-life care "had nothing to do with [his] cause of death."

*Flores*, 2013 WL 1490618, at *2 (alteration in original).

The Michigan Court of Appeals reasonably concluded that the evidence was sufficient for a reasonable jury to find that the stabbing proximately caused Ledbetter's death notwithstanding his drug and alcohol use. Viewing the evidence in the light most favorable to the prosecution, either Flores or his accomplice repeatedly stabbed Ledbetter, breaking a knife blade off in his hip. As Dr. Mason testified, the medical team treating Ledbetter did not remove the blade initially because of "an increased risk of bleeding from any potential surgery." (R. 6-4, PID 227.) (Evidence suggested that Ledbetter had lost 25 percent or more of his blood in the attack. (R. 6-4, PID 227.)) Though the blade was ultimately removed, according to Dr. Mason, the wound's

7

infection never cleared. (R. 6-4, PID 228.) Meanwhile, according to Dr. Virani, bleeding from the stab wounds caused irreversible "alveolar damage" to Ledbetter's lungs. (R. 6-4, PID 242.) As Dr. Virani explained, this type of damage occurs when insufficient blood circulates into the lungs to oxygenate the blood and remove carbon dioxide. (R. 6-4, PID 244, 248.) According to Dr. Virani, the resulting alveolar damage led to pneumonia. (R. 6-4, PID 243.) And as Dr. Virani concluded, the "[m]ain factor" causing Ledbetter's death was "multiple stab wound[s] with complication[s]," including "alveolar damage, pneumonia, and blood loss." (R. 6-4, PID 243.)

To Flores's point that alcohol use was a superseding cause, evidence indeed suggested that Ledbetter started drinking again after a brief hiatus following the stabbing. (*See* R. 6-4, PID 229, 235.) But Dr. Virani testified that alcohol use "has nothing to with alveolar damage unless the person passes out, become[s] unresponsive and cannot breath." (R. 6-4, PID 243–44.) No evidence at trial suggested that happened to Ledbetter between the stabbing and his death. Furthermore, while evidence suggested that Ledbetter overused hydrocodone (a pain medication) (R. 6-4, PID 235), Dr. Virani testified that would not cause death absent an overdose (and nothing suggests that happened here) and that the drug had "nothing to do with [the] cause of death" (R. 6-4, PID 247). And Flores points to no evidence supporting his claim that Ledbetter continued to use crack cocaine after the stabbing. While testimony suggests that Ledbetter had a history of crack cocaine use (R. 6-4, PID 229), and that crack cocaine use could cause lung problems (R. 6-4, PID 245), Dr. Mason testified that nothing in Ledbetter's records suggested any current use (R. 6-4, PID 237).

At bottom, Flores asks this Court to simply disregard Dr. Virani's expert testimony on the cause of Ledbetter's death. The Court will not do that under the governing *Jackson*-AEDPA framework. And in light of the medical evidence at trial, nothing suggests that the Michigan

Court of Appeals' decision on the sufficiency of evidence was erroneous, let alone objectively unreasonable. Thus, Flores has failed to demonstrate his entitlement to relief under § 2254(d).

**B.**

Flores also claims that the prosecutor committed misconduct by vouching for the credibility of Dr. Mason and Dr. Virani during closing argument.

The prosecutor said the following in his rebuttal closing argument:

> Doctor Virani doesn't work for me. He doesn't work for the Waterford Police Department. He's got a statutory duty to sit in his office and when a body comes in to determine whether somebody died of natural causes or died of homicide. There's no bias. You'll get an instruction on that. There's no reason he'd come here and tell you something that he didn't believe. There's no bias. He makes a call based upon his examination of internal organs as to what the cause of death is and an outward look as well as medical records. That is his determination.
>
> Fact witness not an expert. I asked Doctor Mason did, did Mr. Ledbetter ever recover from those injuries? No. Every time he came to the hospital he was septic. He was infected with bacteria. Gee, he's not the People's witness, he's just a guy working in the hospital that's a doctor. Treating physician, one of many. The [victim] was in and out of the hospital every other month, every other week.

(R. 6-4, PID 258–59.)

Flores's counsel did not object at trial, so the Michigan Court of Appeals addressed this claim under plain error review, finding that the prosecutor "did nothing inappropriate." *People v. Flores*, No. 309262, 2013 WL 1490618, at *3 (Mich. Ct. App. Apr. 11, 2013). Respondent urges that Flores's failure to make a contemporaneous objection at trial amounts to a procedural default, barring habeas review. (R. 5, PID 59.) For the sake of efficiency, the Court opts to consider the claim on the merits. *See Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (en banc) ("[J]udicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." (internal citations omitted)). And to be safe, the Court will review the claim *de novo*. *See Trimble*

9

*v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015) (highlighting Sixth Circuit case law inconsistencies on whether plain error review amounts to a decision on the merits warranting AEDPA deference instead of *de novo* review).

On *de novo* review, the Sixth Circuit uses a two-step inquiry for prosecutorial misconduct claims. *See Gumm v. Mitchell*, 775 F.3d 345, 380 (6th Cir. 2014). First, the Court must "determine whether the challenged conduct and remarks by the prosecution were improper." *Id.* (citations omitted). If so, the Court then looks to see if the remark was "flagrant and warrants reversal." *Id.* (citation omitted).

As the Sixth Circuit has explained, "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the [prosecutor] behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999) (citations omitted). "Generally, improper vouching involves either blunt comments" (*e.g.*, "I think the witness was candid") or "comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Id.*

The Court sees no impropriety in the prosecutor's remarks about Dr. Virani. Notably, the challenged comments came in the prosecutor's rebuttal closing argument, after Flores's counsel invited the jury to cast aside Dr. Virani's expert opinion. (*See* R. 6-4, PID 258.) By responding that Dr. Virani was unbiased and was not an agent of the police, the prosecutor "spoke . . . as an advocate seeking to restore, through argument rather than his own personal assurance, the credibility of his . . . witness. That is a permissible prosecutorial function." *United States v. Garcia*, 758 F.3d 714, 723 (6th Cir. 2014) (finding no impropriety even though the prosecutor argued that the a police officer "told you the truth about what happened"); *see also United States*

*v. Boyd*, 640 F.3d 657, 671 (6th Cir. 2011) ("Because defense counsel attacked the credibility of the Government's witnesses, the prosecutors were free to respond by arguing that those witnesses should be believed."). And by pointing out that Dr. Virani had a "statutory duty" to determine the cause of death, the prosecutor simply echoed the doctor's testimony. (*See* R. 6-4, PID 240.)

The prosecutor's comment that Dr. Mason was "not the People's witness, he's just a guy working in the hospital that's a doctor," was somewhat misleading. Though Dr. Mason was Ledbetter's physician and not an agent of the State, the prosecution called him as a witness in the People's case-in-chief. So he *was* the People's witness. But like with Dr. Virani, the prosecutor did not provide any personal belief as to Dr. Mason's credibility, nor did the prosecutor suggest that he had some special knowledge of facts supporting Dr. Mason's credibility. As the Sixth Circuit has explained, its cases "have found improper vouching only where the disputed remark put the spotlight on the prosecutor—the prosecutor's personal beliefs, the prestige of her office, her power to enforce and implement the plea agreement, her unique knowledge of the facts, etc." *Garcia*, 758 F.3d at 724. This is not such a case.

Even if the remark about Dr. Mason was somewhat improper, it was not flagrant enough to warrant reversal. *See Francis*, 170 F.3d at 549–50 (discussing the factors for determining flagrancy). It was an isolated remark. Nothing suggests that it was deliberate, and a mere technical distinction was all that made the remark misleading. Moreover, given that it was followed shortly by the trial court's instruction that the attorneys' statements and arguments were not evidence (*see* R. 6-4, PID 261), and the reality that Dr. Mason (unlike Dr. Virani) did not actually opine on Ledbetter's cause of death (the primary issue in dispute), little prejudice flowed

from the remark. And as discussed, considerable evidence established that Flores proximately caused Ledbetter's death.

In sum, on *de novo* review, Flores's prosecutorial misconduct claim does not warrant habeas relief.

**IV.**

For the foregoing reasons, the Court DENIES WITH PREJUDICE Flores's petition for a writ of habeas corpus (R. 1).

In order to appeal the Court's decision, Flores must obtain a certificate of appealability. To obtain a certificate of appealability, a prisoner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (internal quotation marks and citation omitted). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901–02 (6th Cir. 2002) (per curiam).

Here, jurists of reason would not debate the Court's conclusion that Flores has not met the standard for a certificate of appealability because both of his claims are devoid of merit. Thus, the Court DENIES a certificate of appealability.

Finally, the Court will GRANT permission to appeal *in forma pauperis*, because any

appeal of this decision could be taken in good faith. *See* 28 U.S.C. § 1915(a)(3).

SO ORDERED.

                                                  s/Laurie J. Michelson
                                                  LAURIE J. MICHELSON
Dated: July 10, 2017                         U.S. DISTRICT JUDGE

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 10, 2017.

                                                  s/Keisha Jackson
                                                  Case Manager